Gary **KIPP**, Individually and as Personal Representative on behalf of the Estate of Cheryl D. Kipp, Plaintiff,

v.

**UNITED STATES** of America, By and Through its agencies, the **UNITED STATES AIR FORCE**, the United States Army, and the Armed Services Whole Blood Processing Lab, Defendants.

No. 8:CV91–00141.

United States District Court, D. Nebraska.

March 17, 1995.

Larry R. Demerath, Valley, NE, for plaintiff.

Paul W. Madgett, Asst. U.S. Atty., Omaha, NE, Roger D. Einerson, Nikki M. Calvano, Patricia Reedy, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, Sally R. Johnson, Asst. U.S. Atty., Lincoln, NE, Stuart M. Gerson, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendants.

## MEMORANDUM AND ORDER

SHANAHAN, District Judge.

Gary Kipp brings this action individually and as the personal representative of the Estate of Cheryl D. Kipp, deceased, and alleges negligence by the defendant, the United States of America, concerning Cheryl Kipp. In this "Memorandum and Order," Gary Kipp is designated "Kipp," and the defendant is designated "United States" or the "government."

According to the "Order on Final Pretrial Conference" (filing no. 110), the issues that remain for disposition by this court are:

1. What was the generally accepted standard of care in Fort Knox, Kentucky, or similar localities, for the screening of blood donors by blood donor centers on or about January 16, 1985?

2. Was the defendant, the United States of America, negligent in its screening of the blood donor whose blood was subsequently used by the plaintiff's decedent, Cheryl D. Kipp, i.e., did the defendant breach the appropriate standard of care in the screening of the blood donor whose blood was used by Ms. Kipp?

3. If the defendant breached the appropriate standard of care, were any of the injuries that Cheryl Kipp suffered after her receipt of the blood in question proximately caused by the defendant's negligence?

4. If any of the injuries to Cheryl Kipp were the result of the defendant's negligence, what amount of damages will fairly compensate the plaintiff for those injuries?

By stipulation, the parties have removed all issues regarding alleged negligence in the diagnosis, care and treatment of Cheryl Kipp pertaining to her hysterectomy in February 1985 at Ehrling Bergquist Hospital at Offutt Air Force Base near Bellevue, Nebraska.

Consequently, the only issues and questions to be disposed of in this action are those expressed above in this "Memorandum and Order" regarding the blood obtained by the government at the Camp Memorial Blood Center in Ft. Knox, Kentucky.

Pursuant to 28 U.S.C. § 1346, this court has jurisdiction over the parties and subject matter of this controversy. This action is brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. The parties have agreed that the plaintiff properly filed an administrative claim with the Department of the Army on November 10, 1989, and thereafter timely and properly filed this cause of action on March 8, 1991. See Pre–Trial Order (filing no. 110); 28 U.S.C. § 2675(a).

The court denies the United States' motion for judgment as a matter of law, see Fed. R.Civ.P. 52, and, pursuant to Fed.R.Civ.P. 52(a), makes findings of fact and reaches conclusions of law, all as set forth in this "Memorandum and Order."

### BACKGROUND

Kipp claims that the United States was negligent in screening blood donors at the Camp Memorial Blood Center on or about January 16, 1985. Therefore, Kipp alleges that the government negligently obtained donated blood which contained the human immunodeficiency virus, otherwise known as "HIV" or the "AIDS" virus. The blood obtained in Kentucky was used on February 8, 1985 in a transfusion to Cheryl Kipp during her surgery at the Ehrling Bergquist Hospital in Nebraska and resulted in Cheryl Kipp's acquiring AIDS, the condition which eventually resulted in her death in May 1989.

The first reported case of the HIV transmitted through a blood transfusion was reported in 1982. In December 1984, the FDA issued a memorandum to all registered blood banks in the United States. The FDA memorandum stated that blood banks should: (1) provide educational materials to potential donors informing them of the groups at high risk of AIDS; (2) ask donors specific questions regarding the donors' medical histories that would indicate whether a donor may have contracted AIDS; (3) provide donors with a confidential means whereby the donor could prevent his or her blood or plasma from being used in a transfusion or in the preparation of plasma derivatives; and (4) institute special procedures for handling blood products known to be infected with the AIDS virus.

Darryl Bonner, who was in basic training for the United States Army at Ft. Knox, was the source of the blood transfused to Cheryl Kipp. On January 16, 1985, Bonner donated his blood at the Camp Memorial Blood Center which was operated by the United States Army. At the time of the blood donation by Bonner and subsequent transfusion to Cheryl Kipp, there was no scientifically reliable test to determine whether blood carried the HIV. In January 1985, very little was known about the HIV and AIDS, although medical research had confirmed the identity of the virus believed to be the causative agent of AIDS. Also, there had been isolated reports of AIDS in recipients of blood transfusions. It was not until March 1985, after the transfusion of Bonner's blood to Cheryl Kipp, that the Food and Drug Administration ("FDA") licensed the first screening tests to identify the presence of HIV antibodies in human blood.

When Bonner donated blood in January 1985, the staff of Camp Memorial Blood Center, pursuant to their standard procedure, conducted an orientation for all potential blood donors. During such orientation, Bonner received a pamphlet as a "handout" that identified groups which were at high risk for contracting AIDS. The pamphlet requested that persons believing themselves to be in a high-risk category "should refrain from donating blood or plasma." The pamphlet also described the signs and symptoms of AIDS and stated:

> There is a suggestion that occasionally the disease may have been spread through the transfusion of blood products. Because of this suggestion, your blood bank is asking that you voluntarily refrain from donating blood at this time if you are in any of the currently identified high risk groups above. Although the majority of members of these groups are not carriers, there is presently no means of detection, and thus no mechanisms to identify those few who

may be at high risk. *DO NOT* hesitate to speak to our donor center personnel— Your confidentiality will be preserved. We appreciate the time and effort involved in making a trip to the blood bank and hope that all donors will recognize the necessity of the voluntary screening procedures which have been instituted.

Additionally, as part of the donor-orientation procedure, an employee of the blood center read the center's AIDS informational materials aloud to potential donors. Further, as part of the donation process, each donor, including Bonner, received a donor card which requested that the donor supply information concerning the donor's condition in reference to AIDS and other medical conditions.

Bonner signed the donor card and then was personally interviewed by Rachel Harris Demaree, a senior sergeant at the blood center. During this confidential interview, Demaree, pursuant to the center's standard operating procedure, reviewed with Bonner the answers he had supplied on the donor card. Bonner verified that he had read and understood the AIDS-information pamphlet. Bonner's responses to the questions on the donor card did not indicate that he had contracted AIDS or was at risk for being HIV-positive. Also, Demaree and a phlebotomist at the blood center conducted a physical examination of Bonner, during which Bonner's arms were examined and his vital signs obtained. Demaree also checked for signs of Kaposi Sarcoma, a rare form of cancer sometimes associated with AIDS and asked donors whether they had ever experienced any symptoms of Kaposi Sarcoma. Bonner indicated that he did not have Kaposi Sarcoma. Subsequently, Bonner tested positive for the HIV and in April 1989 died from "HIV/AIDS and related complications."

Dr. Harold Oberman, a clinical and anatomical pathologist with a subspecialty in blood-banking, testified concerning the standard of care applicable throughout the blood banking industry in January 1985. Dr. Oberman testified that the applicable standard of care was a national standard formulated on the basis of information from the American Association of Blood Banks, the FDA, and the Red Cross. Accordingly, the standard of care in Fort Knox, Kentucky regarding blood donations was the same as the standard of care in any other community in the United States.

Oberman also discussed the role of FDA recommendations on blood collection in relation to the standard of care for the blood banking industry. Dr. Oberman noted that the FDA recommendations, expressed in the December 1984 memorandum, were not to be interpreted rigidly, but, rather, were to be adapted to the particular circumstances of each blood bank. Accordingly, the standard of care applicable to the blood-banking industry allowed for variation in the implementation of procedures such as those recommended by the FDA. Although the FDA recommendations were viewed in January 1985 as a factor to be considered in determining the standard of care applicable to blood-donor screening, the FDA recommendations did not, in and of themselves, establish the standard of care. In any event, Camp Memorial Blood Center fully adhered to FDA recommendations which otherwise applied to the particular circumstances of the Camp Memorial Blood Center.

Oberman concluded that in his opinion, to a reasonable degree of medical certainty, the Camp Memorial Blood Center adhered to and met the standard of care applicable to screening blood donors in January 1985.

Dr. Brooks Jackson, a professor of medicine at Case Western University, clinical pathologist, and specialist in blood-banking, also testified regarding the standard of care for screening blood donors. Dr. Jackson testified about the role of FDA recommendations in relation to that standard of care. Jackson's opinion was substantially the same as, and, therefore, consistent with, Oberman's opinion that the Camp Memorial Blood Center fully adhered to the applicable standard of care and, hence, was not negligent in screening Darryl Bonner as a blood donor. According to Jackson, Bonner appeared to be a "suitable donor" on the basis of information acquired by the blood center at Ft. Knox.

## DISCUSSION

To define the standard of care applicable in this case, the court looks to the law of Kentucky, where the alleged negligence occurred. See 28 U.S.C. § 1346(b) (government's liability determined under the law of the state where the act or omission occurred).

In Kentucky, to recover on a claim of medical malpractice, a plaintiff has the burden to prove by qualified expert testimony that: (1) the health care provider had a duty to conform to a particular standard of care; (2) the health care provider did not conform to that standard; and (3) the failure to conform to the standard of care was the proximate cause of the plaintiff's injuries. *Watters v. TSR, Inc.*, 904 F.2d 378 (6th Cir. 1990); *Morris v. Hoffman*, 551 S.W.2d 8 (Ky.App.1977). To determine the standard of care applicable to blood-banking practices at a given time, a court must look to "the conduct of the industry or profession in similar circumstances as of that date." *McKee v. Miles Laboratories, Inc.*, 675 F.Supp. 1060, 1064 (E.D.Ky.1987), *aff'd*, 866 F.2d 219 (6th Cir.1989). See, also, *Doe v. American Nat. Red Cross*, 796 F.Supp. 395 (W.D.Wis.1992) (a blood bank is a health care provider).

Kipp did not present any testimony of an expert witness on the standard of care for blood-banking in Kentucky. Rather, Kipp asserts his negligence claim on the basis of the FDA recommendation, expressed in the memorandum of December 1984, as the applicable standard of care. The court finds and concludes that the FDA recommendation does not establish the standard of care applicable to the government's conduct in the present case. Further, the court finds and concludes that Kipp has failed to meet his burden to prove, by a preponderance of the evidence, that the United States' conduct in obtaining the blood donation from Bonner in Kentucky did not conform to the standard of care pertaining to blood-banking. On the other hand, as reflected in the court's findings of fact, the United States has, by the preponderance of evidence, proved the standard of care applicable to donor-screening and obtaining a blood donation in Kentucky and, moreover, has proved that the United States adhered to that standard of care in obtaining the blood donation from Bonner. Additionally, the court finds and concludes that the conduct of the United States and its staff at the Camp Memorial Blood Center, or any other person associated with obtaining Bonner's blood for eventual transfusion to Cheryl Kipp, was reasonable under the circumstances and, therefore, was not negligent.

In summary, and after consideration of all the evidence, the court finds and concludes that the plaintiff, Gary Kipp, has not proved, by a preponderance of the evidence, that the defendant, United States, failed to satisfy or adhere to the standard of care applicable to blood-donor screening and the collection of blood at the Camp Memorial Blood Center in reference to the blood that was eventually used in the transfusion to Cheryl Kipp. For that reason, the court finds that the plaintiff, Gary Kipp, has failed to prove a case of negligence against the defendant, United States, concerning the blood obtained from Darryl Bonner, that is, the blood used in the transfusion to Cheryl Kipp.

THEREFORE, IT IS ORDERED:

1. That the motion by the defendant, the United States of America, for judgment as a matter of law is denied;

2. That judgment will be entered for the defendant, the United States of America, and against the plaintiff, Gary Kipp;

3. That the complaint and action of the plaintiff, Gary Kipp, will be dismissed with prejudice; and

4. That each party shall bear their own costs.