The **ESTATE OF Grace KO,** a deceased person, by Milton J. **HILL,** her personal representative, Plaintiff,

v.

**SEARS ROEBUCK AND CO.,** Defendant.

Civil No. 97–CV–71283–DT.

United States District Court, E.D. Michigan, Southern Division.

Nov. 6, 1997.

Nicholas Roumel, Ann Arbor, MI, for plaintiff.

Mark E. Hanck, Marvin Wilder, Detroit, MI, for defendant.

## OPINION

DUGGAN, District Judge.

### Introduction

The Estate of Grace Ko ("Ko"), by its personal representative Milton J. Hill ("plaintiff"), brought this action, seeking damages against defendant Sears, Roebuck & Co. arising out of Ko's suicide following an incident in which Sears personnel detained and questioned Ko for shoplifting. Plaintiff's complaint asserts claims of negligence resulting in wrongful death (count I), fraud and misrepresentation resulting in wrongful death (count II), and intentional infliction of emotional distress ("IIED") (count III). Currently before the Court is defendant's motion for summary judgment. For the reasons set forth in this Opinion, the Court grants summary judgment with respect to each of plaintiff's claims.

### Background

Grace Ko was born and raised in Hong Kong, where her parents currently reside. In 1992, she began attending the University of Michigan on a student visa. Ko was a good student and was very family oriented.

On May 31, 1994, Ko went shopping at a Sears store in Ann Arbor, Michigan. Ernest Close, a Sears loss prevention agent, monitored Ko's movements around the store by

means of surveillance cameras. Close video-taped much of these movements. This surveillance lasted for approximately one hour.

In an investigative report prepared by Detective Jerry Tacey of the Ann Arbor Police, Detective Tacey reported that he viewed the videotape and it revealed to him that Ko walked around several departments of the store with various items of merchandise in her possession. At times she draped clothing over this merchandise, after which this merchandise would no longer be visible. She later entered a fitting room carrying jewelry, but when she exited the fitting room she was not carrying the jewelry anymore. Finally, the video revealed that she selected three wallets and then selected a blouse and "use[d] the blouse to cover her left arm and hand to conceal the three wallets," and she later came out of the fitting room without the wallets.

Close testified at his deposition that he apprehended Ko as she was leaving the store. A search of her backpack revealed several wallets, earrings, a watch, and several articles of clothing. There were price tags in her purse that matched the wallets.

Close was then joined by another Sears employee, Andrea Newmeyer. In her report, Newmeyer stated that she observed in Ko's backpack three wallets, a pair of earrings, and some new looking apparel. She further reported that at several times during the questioning, Ko stood up and approached Close, and Close told her to remain seated or he would have to restrain her with handcuffs. Ko did not admit to stealing the items.

When police officers Jerry Tacey and Laura Hobson arrived at the scene, they viewed the videotapes and questioned Close. They also questioned Ko, who maintained her inno-cence. The police then released Ko and allowed her to retain the clothing items.

Shortly thereafter, Close retrieved several price tags in the area where Ko had been shopping. The police believed that these tags matched clothing found in Ko's back-pack and went to her residence to compare them to the clothing items. Finding that some of the clothing matched the tags, the police confiscated the clothes.

In a report submitted by security officer Cynthia Parravano, Ms. Parravano indicated that on June 1, 1994, a woman, who plaintiff believes to be Ko,[1] stated to Ms. Parravano that she had been picked up for shoplifting and was going to school on a visa. The woman asked Ms. Parravano if she could pay for the merchandise in order to avoid going to court. Parravano also stated that this woman told Parravano that "she would pay me and the store whatever I wanted to get out of it," to which Parravano replied, "Now you are trying to bribe me and I don't take bribes." [2]

At approximately 2:30 p.m. on June 1, 1994, Ko called Officer Hobson and asked if there was any way to avoid going to court, such as by paying Sears for the merchandise. Ko also expressed concern about being deported due to the incident. Officer Hobson responded that the incident would be handled by the court system and that Ko should make inquiries regarding deportation to the Immigration and Naturalization Service.[3]

At approximately 4:45 p.m., Ko committed suicide by jumping from her 18th story window. After her death, four receipts were discovered in her purse. Plaintiff believes that these receipts correspond to some of the items Ko was accused of stealing.

Plaintiff maintains that Ko was innocent of shoplifting and that the defendant's employ-

---

1. There is no dispute that this person was in fact Ko.

2. Plaintiff's complaint does not specifically assert any wrongful conduct by Parravano. However, in plaintiff's response to defendant's motion for summary judgment, plaintiff refers to Ko's contact with Parravano on June 1, 1994, thus suggesting that plaintiff may be asserting a claim against defendant based on the conduct of Parravano.

3. This reference to Ko's contact with Hobson, like the reference to Parravano, *see supra* note 2, is not referred to in plaintiff's complaint but is referred to in plaintiff's response to the motion for summary judgment. It is not clear what relevance this "contact" has with respect to any liability against Sears.

ees mistreated Ko. According to plaintiff, this mistreatment caused Ko's suicide.

### Discussion

#### Standard of Review

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of informing the court of the basis for his or her motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant must demonstrate either the absence of a genuine issue of fact or the absence of evidence supporting the nonmoving party's case. 477 U.S. at 325, 106 S.Ct. at 2554. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. at 2552. The substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The district court is not to make credibility determinations or weigh the evidence" upon a motion for summary judgment. *Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir.1994) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513).

When determining whether there is a genuine issue for trial, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *accord Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "Although [the nonmoving party] is entitled to a review of the evidence in the light most favorable to him or her, the nonmoving party is required to do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Pierce v. Commonwealth Life Ins.*

*Co.*, 40 F.3d 796, 800 (6th Cir.1994) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356). Rule 56(e), "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)); *see Pierce*, 40 F.3d at 800. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

#### Count I (Negligence)

Plaintiff's complaint asserts three ways in which defendant negligently caused harm to Ko: 1) defendant failed to properly hire, train, and supervise Close and "other Sears employees"; 2) defendant accused, detained, and interrogated Ko without sufficient evidence of her guilt for shoplifting; and 3) defendant sought prosecution of Ko without good faith and probable cause.

■ To make out a prima facie case of negligence, a plaintiff "must demonstrate that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the defendant's breach of its duty was the proximate cause of the plaintiff's injuries, and (4) the plaintiff suffered damages." *Richardson v. Michigan Humane Society,* 221 Mich.App. 526, 528, 561 N.W.2d 873 (1997).

■ Defendant argues that plaintiff's negligence claim must be dismissed because its agents' actions were not the proximate cause of Ko's death. "In order to constitute proximate cause, it must appear that the injury to plaintiff was the natural and probable consequence of the negligence or wrongful act of the defendant, and that it ought to have been foreseen, in light of the attending circumstances." *Luck v. Gregory*, 257 Mich. 562, 569, 241 N.W. 862 (1932).

A superseding cause is one that intervenes to prevent a defendant from being liable for harm to a plaintiff that the defendant's

antecedent negligence is a substantial factor in bringing about. See 2 Restatement Torts 2d, § 440, p 465. We have previously held that in order to be a superseding cause, thereby relieving a negligent defendant from liability, an intervening force must not have been reasonably foreseeable.

*Hickey v. Zezulka*, 439 Mich. 408, 436–37, 440 Mich. 1203, 487 N.W.2d 106 (1992) (footnote omitted). Generally, a decedent's suicide is considered an unforeseeable intervening act between the defendant's negligent conduct and the decedent's death. *See Scheffer v. Washington City, V.M. & G.S.R. Co.*, 105 U.S.(15 Otto) 249, 252, 26 L.Ed. 1070 (1881); *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir.1990). However, courts have recognized an exception to this general rule "where a decedent was delirious or insane and either incapable of realizing the nature of this act or unable to resist an impulse to commit it." *Watters*, 904 F.2d at 384 (citing *Restatement (Second) of Torts* § 455 (1965)); *see also* W. Page Keeton *et al.*, *Prosser & Keeton on The Law of Torts* 310–11 (5th ed.1984).

Plaintiff argues that defendant's conduct induced Ko to have an "uncontrollable impulse" to kill herself. In *Tate v. Canonica*, 180 Cal.App.2d 898, 915, 5 Cal.Rptr. 28, 40 (1960), the seminal case on this issue, the Court stated:

> [W]here the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. Some cases speak of 'insanity,' and of 'delirium or frenzy,' and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause. We think, in the light of modern knowledge as to mental illness, that this view is too narrow. It should not make any difference that the decedent

'knew what he was doing'. If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself.

In *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286, 1291 (E.D.Mich.1981), the court emphasized that cases such as *Tate* "impos[e] ... exacting requirements as a foundation for the claim." The *Jamison* court went on to state that because the plaintiff has the burden of establishing that the decedent had a mental illness resulting in an "uncontrollable impulse" to kill himself or herself:

> it is essential that a full explanation of the claimed mental illness be offered to assist the trier of fact in resolution of the question of causation. The importance of exact testimony is heightened in a case where the circumstances make it clear, even to the lay observer, that there are very serious questions concerning the nature and the severity of the deceased's mental condition or illness. With few exceptions, one who commits suicide is suffering some abnormal mental condition. Therefore, the explication of the difference between that condition and a mental illness and of the connection between the tort and the illness is indispensable to the plaintiff's case.

*Id.* at 1292.

Plaintiff has shown that Ko was a good student from a caring family, and that both she and her family had high expectations of her. Plaintiff has also produced a report on Ko's suicide authored by Dr. Kenneth J. DeWoskin, Ph.D., a professor of Chinese language and cultures and international business at the University of Michigan. Dr. DeWoskin based his report on the written accounts of the Sears employees and the police, the video tapes of Ko at Sears, interviews with Ko's parents in Hong Kong, and "35 years of experience with China and Chinese." Dr. DeWoskin wrote that "While to us it may seem that suicide was an outcome disproportionate to the dangers the shoplifting charge posed, there are cultural reasons that what transpired in the Sears store on May 31 and June 1, 1994 could lead to Ms.

Ko's suicide." For example, criminal defendants are often presumed guilty in Chinese societies, and this incident would be "extremely painful, shameful, and humiliating to a Chinese and family." Dr. DeWoskin also indicated that Ko was probably confused and frightened:

Ms. Ko would not have understood the process in which she had become intwined. She would probably not know words like "Miranda," "self-incrimination," or "misdemeanor." She would most certainly have overestimated the risks that the situation posed to her future. She would have foreseen the possibility of two disastrous outcomes. She would anticipate the possibility of going to jail or losing her student visa, either of which would interrupt her studies and be a source of major shame for herself and her family. Either outcome was essentially the end of her life, given the responsibilities she bore in coming to the U.S.

Finally, Dr. DeWoskin concluded,

Faced with jail and the interruption of her studies, Grace made a choice that was rational to her and that showed a certain amount of courage. Her suicide says absolutely nothing about her guilt or innocence, since she likely had very little understanding of the possibility that she could successfully defend herself against the charges and no understanding of the real range of possible outcomes from the charges.

The Court does not believe that plaintiff has met the "exacting" burden of establishing that Ko had a mental illness resulting in an irresistible impulse to kill herself. Plaintiff acknowledges that "[c]ertainly Grace Ko could have voluntarily chosen against suicide, but Sears' outrageous conduct left her with no better option, from her perspective." (Pl.'s Br. at 15.) Also, Dr. DeWoskin acknowledged that Ko made a "choice" in deciding to end her life. Furthermore, Dr. DeWoskin's report does not purport to indicate that Ko committed suicide due to a mental illness. Instead, it shows that Ko was probably frightened by the events of May 31 and June 1. While this evidence may explain Ko's outlook on these events, i.e., her

"mental condition", it does not show that Ko had a mental illness or that she had no choice but to kill herself. Because plaintiff has pointed to no evidence that would allow a jury to conclude that plaintiff suffered from a mental illness, plaintiff cannot establish liability. This Court is satisfied that the evidence presented supports a conclusion, as a matter of law, that plaintiff's suicide in this case was an unforeseeable intervening act between defendant's conduct and Ko's death. *See Scheffer,* 105 U.S. (15 Otto) at 252; *Watters,* 904 F.2d at 383. The Court therefore shall grant defendant's motion for summary judgment.

### Count II (Fraud and Misrepresentation)

■■■ Plaintiff's misrepresentation claim is based on alleged false statements made by Close to the police, which the police relied on in making their investigation of Ko.

Claims for fraudulent misrepresentation require proof that (1) the defendant made a material misrepresentation, (2) it was false, (3) the defendant knew it was false when made, or made it recklessly, without knowledge of its truth and as a positive assertion, (4) it was made with the intention to induce reliance upon it, (5) the plaintiff acted in reliance upon it, and (6) the plaintiff thereby suffered injury.

*State-William Partnership v. Gale,* 169 Mich. App. 170, 178, 425 N.W.2d 756 (1988).

Reliance by the plaintiff is essential to a claim of misrepresentation. *See Phinney v. Perlmutter,* 222 Mich.App. 513, 534–35, 564 N.W.2d 532 (1997). Plaintiff's complaint does not even *allege* any reliance by Ko on the alleged false statements attributed to Close. The complaint alleges:

82. When he made these representations, he intended the *officers* to rely upon them in order to pursue a retail fraud or shoplifting case against Grace Ko. (Emphasis added).

83. The officers did rely on Close's representation. . . .

(Pl.'s Compl. at ¶¶ 82 and 83).

Since plaintiff does not even allege that Ko acted in reliance upon the "false" statement, plaintiff cannot meet the requirement that

"the plaintiff acted in reliance upon" the alleged false statements. *Gale,* 169 Mich.App. at 178, 425 N.W.2d 756.[4]

In sum, because plaintiff cannot establish any "reliance" by plaintiff with respect to the alleged false statements, plaintiff cannot prove a claim of fraudulent misrepresentation.

Furthermore, based on the "evidence" submitted in support of and in opposition to the motion for summary judgment, this Court cannot conclude that plaintiff can produce sufficient competent evidence to establish that the statements attributed to Close were, in fact, false. · Therefore, this claim must be dismissed.

### Count III (IIED)

■ "The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, (4) severe emotional distress." *Haverbush v. Powelson,* 217 Mich.App. 228, 233–34, 551 N.W.2d 206 (1996), *appeal denied,* 564 N.W.2d 37 (1997).

■ Plaintiff alleges that the defendant is liable for this tort because its employees made "outrageous false accusations" against Ko, searched Ko's backpack in public, unjustifiably threatened to handcuff Ko, and accused Ko of bribery.

Defendant argues that this conduct was not sufficiently outrageous to make out an IIED claim. "Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Johnson v. Wayne County,* 213 Mich.App. 143, 161, 540 N.W.2d 66 (1995), 213 Mich.App. 143, 540 N.W.2d 66, *appeal denied,* 554 N.W.2d 903 (1996). This standard is met if "the recitation of the facts to an average member of the community would arouse . his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Doe v. Mills,* 212 Mich.App. 73, 91, 536 N.W.2d 824 (1995), *appeal denied,* 452 Mich. 869, 552 N.W.2d 168 (1996).

The Court agrees with defendant that this conduct is not sufficiently "outrageous" to make out an IIED claim. The evidence before the Court indicates that, even if Ko was not guilty of shoplifting, Close had an adequate basis for detaining Ko and calling the police. According to Close's testimony and Officer Tacey's narrative report regarding the videotape, Ko behaved in a suspicious manner. Moreover, after Close detained her, he found what appeared to be Sears merchandise in plaintiff's backpack. Based on this evidence, it was not "outrageous" for Close to call the police.

In response to this evidence, plaintiff asserts that Close fabricated these charges. According to plaintiff, this is evidenced by the fact that the videotape does not show Ko with earrings in her possession, Ko removing clothes from the store, or Ko entering a fitting room; as indicated by Close. Plaintiff's argument fails to acknowledge that the videotape is not the sole basis for Close's suspicions about Ko. Close had at least 32 cameras to monitor, and he explained in his deposition that· some of the actions he witnessed were not necessarily recorded on the videotape. Close's accusations were also based on the fact that he found merchandise that he believed belonged to Sears in Ko's possession. The mere fact that not each of Close's statements can be verified by means of the videotape does not show that Close's statements were fabricated.

Moreover, the Court does not believe that Close's public searching of Ko's backpack is sufficiently outrageous to support an IIED claim. In *Clarke v. K Mart Corp.,* 197 Mich. App. 541, 548, 495 N.W.2d 820 (1992), *appeal denied,* 443 Mich. 862, 505 N.W.2d 581

---

**4.** Although not asserted in the complaint, plaintiff, in the response to the motion for summary judgment states that "Defendant made several false statements, that both plaintiff relied upon herself, and that the police officers relied upon in their investigation." (Pl.'s Resp. at 18). However, to the extent that such "false" statements related to conduct of Ko, she would have known that such statements were false and thus such statements could not have induced reliance by her. *See Perlmutter,* 222 Mich.App. at 535, 564 N.W.2d. 532. ("[S]omeone who knows that a representation is false cannot rely on that representation.")

(1993), the court rejected an IIED claim where a store employee allegedly snatched a bag of recently purchased items out of the plaintiff's hands, checked the contents of the bag, and detained the plaintiff for fifteen minutes before ascertaining that there were no stolen items in the bag. The instant case presents less egregious facts than *Clarke*, there being no allegation of a forceful "snatching" of Ko's backpack from her possession.

Finally, with respect to Close's warning that he would handcuff Ko if she did not remain seated and Parravano's statement that Ko was trying to "bribe" her,[5] the Court does not believe that these statements rise to the level of extreme and outrageous conduct. *See Restatement (Second) of Torts* § 46 cmt. d ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."); *accord Ledsinger v. Burmeister*, 114 Mich.App. 12, 18, 318 N.W.2d 558 (1982).

Because plaintiff has not come forward with facts indicating that defendant's agents acted in a sufficiently outrageous manner, the Court grants summary judgment with respect to this claim as well.

### Conclusion

For the reasons presented above, the Court grants defendant's motion for summary judgment. An Order consistent with this Opinion shall issue forthwith.

---

**5.** As previously indicated, *see supra* note 2, plaintiff's complaint does not assert any claim based on Parravano's conduct. However, to the extent that plaintiff's response to defendant's motion for summary judgment reflects an intent by plaintiff to include this claim as a claim against one of the "other Sears employees," this Court deems it appropriate to specifically address this claim.