Andrea WILSON, individually and in her capacity as administratrix of the Estate of Noah Wilson, Plaintiff,

v.

MIDWAY GAMES, INCORPORATED, Defendant.

No. 3:00CV2247(JBA).

United States District Court, D. Connecticut.

March 27, 2002.

168

Joseph A. Moniz, Moniz, Cooper & McCann, Hartford, CT, for plaintiff.

David L. Belt, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Gerald O. Sweeney, Jr., John T. Williams, Lord, Bissell & Brook, Chicago, IL, Stephen G. Murphy, Jr., Milano & West, Branford, CT, for defendant.

*Ruling on Motions to Dismiss*
*[Doc. # 25 & # 43]*

ARTERTON, District Judge.

On November 22, 1997, thirteen-year-old Noah Wilson died when his friend, identified as Yancy S., stabbed him in the chest with a kitchen knife. Noah's mother, Andrea Wilson, filed this suit against Midway Games, Inc., alleging that at the time Yancy stabbed Noah, Yancy was addicted to a video game manufactured by Midway called Mortal Kombat, and that Yancy was so obsessed with the game that he actually believed he was the character Cyrax.

Wilson claims that Midway's design and marketing of Mortal Kombat caused her son's death. She alleges that she is entitled to damages under theories of product liability, unfair trade practices, loss of consortium, and negligent and intentional infliction of emotional distress. Jurisdiction is predicated on diversity of citizenship.

Midway has moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), on the grounds that even if everything Wilson alleges is true, she has not stated a claim for which relief can be granted. The first motion to dismiss [Doc. # 25] claims that Wilson's allegations fail as a matter of state tort law. Specifically, Midway argues that: Mortal Kombat is not a "product" that can give rise to a product liability claim; Wilson's CUTPA action is time-barred; a loss of consortium claim cannot be maintained by a parent based on the death of her child; and Wilson cannot recover for negligent or intentional emotional distress because Midway owed no duty to her or Noah and Midway's design and marketing of Mortal Kombat was not the legal cause of any injury sustained by her or her son. After oral argument on the first motion, Midway filed a second motion to dismiss [Doc. # 43] addressed to what Midway claims are constitutional infirmities in plaintiff's complaint. Midway claims that both the Connecticut constitution and the U.S. constitution bar an action to recover damages from the maker of a video game such as Mortal Kombat, when the basis for liability is alleged to be the expressive content of the game.

For the reasons set out below, the Court concludes that Wilson's complaint, while artfully drafted and skillfully defended at oral argument and in the briefing, nonetheless fails to state a claim upon which relief can be granted: the product liability counts fail because Mortal Kombat is not a "product" within the purview of the CPLA; the unfair trade practices claim is time-barred; the loss of consortium claim is not recognized under Connecticut law in this context; and the negligent and intentional infliction of emotional distress claims are precluded by the First Amendment. Thus, the Court grants Midway's motions, and Wilson's claims are dismissed in their entirety.

I. Facts

In her complaint, Wilson describes Mortal Kombat as a virtual reality video game that uses sophisticated technology to make players physically feel as if they are killing the characters in the game, and rewards players when they tap their "killer re-

sponses."[1] She alleges that "Mortal Kombat was designed with the use of extremely sophisticated futuristic technology that was intended to cause the user to believe and physically feel that he is actually participating in the violent battles,"[2] and describes the vast technological advances in video game technology that have taken place since the advent of the medium thirty years ago: "The games have gone from bouncing a little white ball from side to side on a screen to games of virtual reality in which the player has an active role within the game."[3]

Wilson describes the game as having seven fictional characters, each of which has a unique fighting style, including method of killing opponents, or "finishing move."[4] The characters advance through the various levels of the game by using increasing levels of violence, which Wilson claims presents violence as a viable problem-solving technique.[5] Significantly, Wilson states that Mortal Kombat differs from media such as motion pictures and music "in one significant respect—they are interactive, permitting the [player] to control, or even assume the identity of, a digitalized game character."[6]

One of the characters, "Cyrax," kills his opponents by grabbing them around the neck in a "headlock" and stabbing them in the chest.[7] Wilson claims that Yancy used this same maneuver to stab her son, and that Yancy was addicted to Mortal Kombat when he killed Noah. She further alleges that Midway designed Mortal Kombat to addict players to the exhilaration of vio-

lence,[8] and specifically targeted a young audience, intending to addict them to the game.[9]

## II. Standard

Courts dismiss complaints at the 12(b)(6) stage "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir.2001) (internal citations and quotations omitted). It is important to remember that "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *County of Suffolk v. First Am. Real Estate Solutions*, 261 F.3d 179 (2d Cir.2001) (internal citations and quotations omitted).

When considering a motion to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6), the Court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 127 (2d Cir.2001). The case will not be dismissed unless the Court is "satisfied that the complaint cannot state any set of facts that would entitle [the plaintiff] to relief." *Id.* However, because "bald assertions and conclusions of law will not suffice to state a claim," *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000) (citation omitted), the Court "need not accept averments which are legal conclusions unsupported by the facts alleged elsewhere in the complaint." *K–Mart Corp. v. Midcon Realty Group of*

---

1. Am. Compl. ¶ 3 & 4.

2. Am. Compl. ¶ 4.

3. Am. Compl. ¶ 7.

4. Am. Compl. ¶ 3.

5. Am. Compl. ¶ 8.

6. Am. Compl. ¶ 6.

7. Am. Compl. ¶¶ 18 & 19.

8. Am. Compl. ¶ 5.

9. Am. Compl. ¶ 15.

*Conn., Ltd.*, 489 F.Supp. 813, 814 (D.Conn. 1980) (citations omitted).

### III. Product Liability Claim

The first and second counts of Wilson's complaint are brought under Connecticut's product liability statute. The first count is styled as a failure to warn of Mortal Kombat's "inappropriate level of violent content" and "mentally-addictive" nature, while the second count is a defective design claim.

■ The Connecticut Product Liability Act ("CPLA" or "Act"), Conn. Gen.Stat. §§ 52–572m *et seq.*, is the exclusive remedy for all claims of injury and property damage alleged to have been caused by defective products. CPLA merges the various theories of liability—including strict liability and failure to warn—into one cause of action: the "product liability claim." Conn. Gen.Stat. § 52–572m(b).[10] "The legislature clearly intended to make [CPLA] an exclusive remedy for claims falling within its scope." *Winslow v. Lewis–Shepard, Inc.*, 212 Conn. 462, 471, 562 A.2d 517 (1989).

There are several substantive elements that must be present for a claim to fall within the scope of CPLA. Specifically, a CPLA claim can only be asserted against a "product seller," Conn. Gen.Stat. § 52–572n(a)—and whether the defendant in any given case is a product seller is an issue that often turns, as it does here, on whether the item involved is considered a "product." Conn. Gen.Stat. § 52–572m.[11]

Apart from the definitional prerequisites to bringing a CPLA claim and several other provisions not at issue here, CPLA contains little in the way of substance regarding liability for injuries caused by products. *See LaMontagne v. E.I. Du Pont De Nemours & Co.*, 41 F.3d 846, 856 (2d Cir.1994) ("CPLA was not meant to eliminate [common law] substantive rights [and] does not itself spell out the types of claims it consolidates"). Thus, although a product liability claim is a single cause of action and certain uniform provisions apply, different common law theories of liability undergird this statutorily-created cause of action.[12]

■ Wilson's complaint asserts product liability claims, thereby necessarily alleging that Mortal Kombat is a "product" within the scope of the CPLA. She supports her CPLA claim with two separate theories of liability. First, she asserts a "failure to warn" theory, claiming that her

---

10. " 'Product liability claim' includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."

11. " 'Product seller' means any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use of consumption . . . ." Conn. Gen.Stat. § 52–572m(a). "Product" is never defined. *See generally* James H. Rotundo & Paul D. Williams, *Connecticut Product Liability Law* 3 (1998).

12. *See, e.g.*, Robert B. Adelman & Mary Ann Connors, *The Legal Framework of a Products Liability Case in Connecticut*, 67 Conn. B.J. 355, 361 (1993) ("[T]he purpose of [CPLA] cannot be to abolish the common law theories of liability. Instead, our Act unites the common law theories in one cause of action within its procedural framework [and] creates uniform procedures and remedies for product claims.") (footnotes omitted).

son's injuries and death "were the result of the defendant's failure to warn of the inappropriate level of violent content and mentally-addictive nature of the products it marketed and sold and the foreseeable risks that are likely to result from use of its products by individuals in decedent's age group."[13] Second, she advances a design defect theory, claiming that the interactive video game was "negligently and/or intentionally designed by defendant Midway," and that her son's injuries and death "were the result of defendant Midway's negligent and/or intentional design of a dangerous product, and its reckless disregard for the safety of its products."[14]

In its motion to dismiss, Midway argues that Wilson's CPLA claim cannot be maintained at all, because Mortal Kombat is not a "product" within the meaning of CPLA. "Apart from the statutes that define 'product' for the purposes of determining products liability, in every instance it is for the court to determine as a matter of law whether something is, or is not, a product." Restatement (Third) Torts: Products Liability § 19 cmt. a (1998). Midway contends that although the term "product" is never defined in CPLA, it "cannot be contorted to include ideas or expression."[15] In support of this proposition, Midway relies on cases from other jurisdictions in which courts refused to permit strict product liability claims based on information contained in books, magazines and motion pictures. *See, e.g., Winter v. G.P. Putnam's Sons,* 938 F.2d 1033 (9th Cir.1991) (mushroom enthusiasts who relied on erroneous information in encyclopedia of mushrooms had no strict products liability claim against publisher when they became ill); *Watters v. TSR, Inc.,* 904 F.2d 378, 380–381 (6th Cir.1990) (mother of teenage boy who played Dungeons and Dragons game had no strict products liability claim against game manufacturer for son's suicide); *Sanders v. Acclaim Entm't, Inc.,* 188 F.Supp.2d 1264, 1278–80 (D.Colo. 2002) (victims of school shooting perpetrated by students who watched violent motion pictures and played violent video games had no strict liability claim against manufacturers and distributors of video games and motion pictures).

While Midway never draws the distinction, these cases can be roughly divided into two analytically distinct classes. The first are cases similar to the mushroom enthusiasts' claim in *Winter:* they involve harm resulting from reliance on instruction manuals, cookbooks, navigational charts and similar materials. While persuasive arguments can be raised both in support of and in opposition to the imposition of products liability for misinformation in various circumstances,[16] Wilson's claim is not a

---

13. Am. Compl. ¶ 30.

14. Am. Compl. ¶¶ 32–33.

15. Def.'s Mot. Dismiss at 17.

16. One commentator has called for the creation of a "commercial intellect products liability" doctrine that would provide a remedy for the harm that befalls a cook, for example, when preparing a recipe from a cookbook that calls for the use of a poisonous root. Jonathan B. Mintz, *Strict Liability for Commercial Intellect,* 41 Cath. U.L.Rev. 617 (1992), *discussing Cardozo v. True,* 342 So.2d 1053 (Fla.Dist.Ct.App.1977) (plaintiff failed to state a claim under UCC implied warranty theory of strict liability regarding recipe which called for use of root that was poisonous when uncooked, and plaintiff was injured when she tasted the raw root while preparing the dish). These "commercial intellect" cases are about misinformation, and "[m]ost courts, expressing concern that imposing strict liability for the dissemination of false and defective information would significantly impinge on free speech have, appropriately, refused to impose strict products liability in these cases." Restatement (Third) Torts: Products Liability § 19 cmt. d (1998). There are, however, exceptions. *See, e.g., Saloomey v. Jep-*

"commercial intellect" or faulty instruction case of the *Winter* variety, and Midway's reliance on those cases is misplaced.

The second class of cases involves claims more akin to the game player's claim in *Watters*. While these claims also involve harm allegedly resulting from the intellectual aspects of magazine articles, games, motion pictures and internet web sites, that harm is a result of alleged exhortation, inspiration or "brainwashing" rather than the result of simply following the instructions.[17] Courts that have addressed the proposition that this "inciting" media speech is a "product" for the purposes of strict liability have rejected it. *Watters v. TSR, Inc.*, 904 F.2d 378, 380–381 (6th Cir. 1990) (role-playing Dungeons and Dragons game not a product); *Herceg v. Hustler Magazine, Inc.*, 565 F.Supp. 802, 803 (S.D.Tex.1983) ("inflammatory article on the practice of 'autoerotic asphyxiation'" not a product); *James v. Meow Media, Inc.*, 90 F.Supp.2d 798, 811 (W.D.Ky.2000) ("intangible thoughts, ideas and messages contained within games, movies, and website materials are not products for the purposes of strict products liability"); *Sanders*, 188 F.Supp.2d at 1277–80 ("thoughts, images, ideas, and messages contained in movies and video games" not products). The line drawn in these cases is whether the properties of the item that the plaintiff claimed to have caused the harm was "tangible" or "intangible." This line is reflected in the Restatement, which defines a product as "tangible personal property distributed commercially for use or consumption." Restatement (Third) Torts: Products Liability § 19 (1998).

While there are no Connecticut cases on point, the Court finds the cases cited above to be both analogous and persuasively reasoned. Additionally, they reflect the Restatement, which is frequently relied on by the Connecticut Supreme Court, *see, e.g., Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 575–578, 657 A.2d 212 (1995), especially in the strict liability context, *see, e.g., Hoelter v. Mohawk Service, Inc.*, 170 Conn. 495, 500–502, 365 A.2d 1064 (1976); *Wagner v. Clark Equipment Co., Inc.*, 243 Conn. 168, 189, 700 A.2d 38 (1997). For these reasons, the Court concludes that the Connecticut Supreme Court would similarly hold that "inciting" media speech is not a product within the scope of the CPLA.

In her opposition to Midway's motion, Wilson does not attempt to persuade the Court to deviate from the weight of authority on either the commercial intellect or the inciting media speech analyses. Rather, she seeks to distinguish Mortal Kombat from the books, magazines and motion pictures that have been at issue in the cases decided to date by pointing to Mortal Kombat's sophisticated technology: "the nature of today's virtual reality technology ... merges the idea or expression ... with the technology ... such that the 'product' is the combination of the expression and the technology."[18]

Stated differently, Wilson essentially claims that the ideas and expressions in the game are wrapped into a technology so sophisticated that the line drawn in the cases between, for example, the ink and

---

*pesen & Co.*, 707 F.2d 671 (2d Cir.1983) (navigational chart used by pilots is a product for § 402A purposes).

**17.** *Cf.* Andrew B. Sims, *Tort Liability for Physical Injuries Allegedly Resulting From Media Speech: A Comprehensive First Amendment Approach*, 34 Ariz. L.Rev. 231 (1992) (dividing

"media speech" tort cases into four categories: instruction, exhortation [which includes subliminal messages], inspiration and facilitation).

**18.** Pl.'s Opp'n Mot. Dismiss at 19.

paper upon which Shakespeare's sonnets were penned and the ideas expressed in the sonnets themselves, simply collapses, because there is no longer any way to distinguish between the physical "container" of the ideas and the ideas themselves. This is reminiscent of Marshall McLuhan's famous maxim that "the medium is the message," [19] which posits that "the sociological and psychological impact of a medium lies as much in the way it delivers content as it does in the content itself." Dan L. Burk, *Patenting Speech*, 79 Tex. L.Rev. 99, 113 (2000).

In distinguishing Mortal Kombat from books, motion pictures and television shows, Wilson has focused her complaint on the interactive nature of the game. It is this interactive feature, then, that must be a "product" if Wilson's CPLA claim is to survive. While Wilson has skillfully argued that Mortal Kombat is something more than motion pictures or television programs, the "something more" is its interactivity. She offers no persuasive reason for distinguishing the technological advances that led to Mortal Kombat's creation from developments at the turn of the twentieth century that ushered in the motion picture. The pictoral representation that evokes the viewer's response is the essence of the claimed "product," regardless of whether that representation is viewed passively, as in a motion picture, or is controlled by the viewer.

Mortal Kombat is not sufficiently different in kind to fall outside the "intangible" category that is demarcated in the case law, and thus the video game if proved as Wilson has described it in her pleadings cannot be a product within the ambit of the CPLA. Therefore, the first and second

counts of the complaint fail to state a claim upon which relief can be granted.

## IV. CUTPA Claim

Wilson's complaint also alleges that Midway's "aggressive marketing tactics to adolescents" violate the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42–110b *et. seq.*[20] Midway argues that Wilson's CUTPA allegations must fail for either of two reasons: first, they are time-barred by the statute of limitations; and second, CUTPA is a "penal statute" so any action founded upon it does not survive Noah's death by virtue of Conn. Gen.Stat. § 52–599(c)(3), which provides that actions "brought upon a penal statute" cannot be brought by a decedent's executor or administrator.

CUTPA has a three year statute of limitations. Conn. Gen.Stat. § 42–110g(f). Midway argues that because any cause of action accrued on or before November 22, 1997, when Yancy killed Noah, Wilson's CUTPA claim is time-barred if commenced after November 22, 2000. Because Wilson's complaint was filed on November 22, 2000, but not served until December 19, 2000, the dispositive question on this point is whether filing or service of the complaint commences an action.

■ When a federal court adjudicates state law claims, " 'state statutes of limitations govern the timeliness of state law claims', and state law 'determines the related questions of what events serve to commence an action and to toll the statute of limitations'." *Diffley v. Allied–Signal, Inc.*, 921 F.2d 421, 423 (2d Cir.1990), *quoting Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir.1989); *accord Converse v. General Motors Corp.*, 893 F.2d 513 (2d Cir.1990) ("It is well established that the doctrine

---

**19.** Marshall McLuhan, *Understanding the Media: The Extensions of Man* 7 (1964).

**20.** Am. Compl. ¶ 37.

enunciated in *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applies to the manner in which a diversity action is considered commenced for purposes of state statutes of limitations."); *Walker v. Armco Steel Corp.,* 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). Because Wilson's claims against Midway are all state law claims, Connecticut law determines whether filing or service of the complaint "commences" an action for tolling purposes. *See id.*

■ Wilson's action would be timely if commencement were governed by the Federal Rules of Civil Procedure, which provide that an action is commenced upon the filing of the complaint. Fed.R.Civ.P. 3. However, "the Connecticut Supreme Court has long adhered to the rule that only actual service upon the defendant will satisfy the state statutes of limitations." *Converse,* 893 F.2d at 516, *citing, inter alia, Consolidated Motor Lines, Inc. v. M & M Transp. Co.,* 128 Conn. 107, 20 A.2d 621 (1941) and *Jencks v. Phelps,* 4 Conn. 149, 152, 1822 WL 7 (1822). Under this standard, Wilson's action was not commenced until December 19, 2000, after the applicable time limit.

■ Wilson argues that the three year statute of limitations should be tolled by Conn. Gen.Stat. § 52–595 because Midway fraudulently concealed the dangerous nature of its product.[21] She asserts that at first, she believed Noah tripped and fell into the knife that Yancy was holding, and only later did she learn of what she now alleges are the true facts of the case.[22]

■■ Under Connecticut case law, "to prove fraudulent concealment, the plaintiff [is] required to show: (1)[the] defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff['s] cause of action; (2)[the] defendant's intentional concealment of these facts from the [plaintiff]; and (3) that [the] defendant's concealment of the facts [was] for the purpose of obtaining delay on the plaintiff['s] part in filing a complaint on their cause of action." *Bartone v. Robert L. Day Co., Inc.,* 232 Conn. 527, 533, 656 A.2d 221 (1995). "The defendant['s] actions must have been directed to the very point of obtaining the delay in filing the action of which [it] afterward seek[s] to take advantage by pleading the statute." *Gibbons v. NER Holdings, Inc.,* 983 F.Supp. 310, 316 (D.Conn. 1997), *quoting verbatim Bound Brook Ass'n v. Norwalk,* 198 Conn. 660, 665–666, 504 A.2d 1047 (1986).

Wilson asserts that the basis of her CUTPA claim is the defendant's practice of marketing Mortal Kombat. In her brief in opposition, she alleges that the defendant "intentionally concealed this information from the plaintiff and public in general in order to prevent plaintiffs such as here from pursuing causes of action for such unfair trade practices . . . ."[23]

Wilson's complaint alleges no facts suggestive of concealment, however. The claimed deceptive marketing practices include "saturat[ing] other industries with products made in the likeness of the characters in the video game,"[24] marketing and advertising Mortal Kombat "in devices

---

**21.** Conn. Gen.Stat. § 52–595 provides: "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."

**22.** Pl.'s Opp'n Mot. Dismiss at 22.

**23.** Pl.'s Opp'n Mot. Dismiss at 22.

**24.** Am. Compl. ¶ 34.

that they were certain children and adolescents would be exposed to including, but not limited to, teen television shows,"[25] and supplying Mortal Kombat to "outside vendors, such as video game rental establishments, video arcades and local businesses."[26]

All of these practices are open and public, and they form the basis for Wilson's alleged CUTPA violation. The concealment, which is never actually identified, is logically inconsistent with the complained-of activity. As the complaint contains no facts which if proven could show that Wilson meets the *Bartone* elements of fraudulent concealment, Wilson's tolling argument fails. Her CUTPA claim is thus time-barred, and it is not necessary to address Midway's claim that the CUTPA action did not survive Noah's death.

V. Filial Loss of Consortium

Wilson seeks damages in her own right for loss of filial consortium as a result of the death of her son. Midway moves to dismiss Wilson's loss of consortium claim on the ground that Connecticut does not recognize a parent's claim for loss of consortium following the death of his or her child. Both parties agree that there are no Connecticut Supreme Court cases on point, and the lower courts are divided on the issue. *Compare Mahoney v. Lensink,* 17 Conn.App. 130, 550 A.2d 1088 (1988), *rev'd on other grounds,* 213 Conn. 548, 569

A.2d 518 (1990) (loss of consortium claim arises out of marital contract only), *with, e.g., Pacelli v. Dorr,* No. CV 960382547S, 1998 WL 470580 (Conn.Super. July 31, 1998) (recognizing loss of filial consortium claim); *see also id.* (acknowledging split in lower court decisions and collecting cases).

In *Belliveau v. Stevenson,* 123 F.3d 107 (2d Cir.1997), the Second Circuit made a so-called "Erie prediction"[27] that the Connecticut Supreme Court would not recognize such a claim. *Belliveau* begins with the proposition that at common law, there is no recovery for wrongful death and resulting damages. *Id.* at 108–109, *citing Ecker v. Town of West Hartford,* 205 Conn. 219, 530 A.2d 1056 (1987) and *Lucier v. Hittleman,* 125 Conn. 635, 7 A.2d 647 (1939) ("We have recognized it as a rule of the common law generally applicable that no action lies for damages resulting from the death of a human being."). Instead, "death and its direct consequences can constitute recoverable elements of damage only if, and to the extent that, they are made so by statute." *Foran v. Carangelo,* 153 Conn. 356, 359–360, 216 A.2d 638 (citations omitted).[28] Given that there is no Connecticut statute providing for a filial loss of consortium claim, the *Belliveau* court reasoned that such a claim is not viable in Connecticut. 123 F.3d at 110 ("Connecticut law plainly does not recognize any postmortem claims absent ex-

---

**25.** Am. Compl. ¶ 35.

**26.** Am. Compl. ¶ 37.

**27.** Under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), courts sitting in diversity apply the substantive law of the state to outcome-determinative questions. Where there is no controlling case law from the state's highest court, a federal court sitting in diversity must predict how the highest court would resolve the issue. *McCarthy v. Olin Corp.,* 119 F.3d 148, 153 (2d Cir.1997). On the difficulty of making these predictions,

see generally Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism,* 78 Va. L.Rev. 1671 (1992).

**28.** Connecticut's wrongful death statute makes death "an element of damage for which recovery may be obtained pursuant to the procedure specified in that statute. But the statutory right of action belongs, in effect, to the decedent, and to the decedent alone." *Id.* at 360, 216 A.2d 638 (citations omitted).

press statutory authorization—authorization which, for loss of filial consortium claims, does not now exist. Thus there is no cause of action for postmortem loss of filial consortium under Connecticut law.").

In *Ladd v. Douglas Trucking Co.*, 203 Conn. 187, 523 A.2d 1301 (1987), the Connecticut Supreme Court applied the same analysis and found that no claim for postmortem loss of spousal consortium was available under Connecticut law. This result was later abrogated by statute, when the legislature amended Connecticut's wrongful death act to include loss of spousal consortium claims. *See* Conn. Gen.Stat. §§ 52–555a through 52–555c. However, while recognizing a spousal loss of consortium claim, this statute is silent as to any filial loss of consortium claim.

As the court in *Belliveau* recognized, 123 F.3d at 110, some Connecticut trial courts have nonetheless recognized a claim for filial loss of consortium, relying on public policy concerns. *See, e.g., Pacelli,* 1998 WL 470580 ("The decisions supporting filial consortium claims draw a parallel between the legal contract of marriage and the constitutionally protected right of a parent to the companionship, care, custody and management of his child."). While these are valid concerns, a determination of the appropriateness and scope of a parent's remedy for his or her child's wrongful death is one to be made by the legislature. *Cf. Belliveau,* 123 F.3d at 110–111. Wilson's claim in her individual capacity as Noah's mother for loss of filial consortium must, therefore, be rejected.

**VI. Intentional and Negligent Infliction of Emotional Distress Claims**

 In response to Wilson's claims for negligent and intentional infliction of emotional distress, Midway has advanced argu-

ments based on two general grounds. First, it argues that Wilson cannot recover as a matter of state tort law, as Midway owed no duty and, alternatively, Yancy's criminal act of stabbing Noah constitutes an intervening cause that breaks the legal chain of causation and relieves Midway of liability. Second, Midway argues that both the Connecticut and federal constitutions preclude a recovery of damages in this context, because Mortal Kombat is protected speech that poses no imminent threat of lawless activity.

**A. Connecticut Tort Law**

 The Second Circuit has noted that "where possible, courts will render decisions on federal constitutional questions unnecessary by resolving cases on the basis of state law (whether statutory or constitutional)." *Allstate Ins. Co. v. Serio,* 261 F.3d 143, 150 (2d Cir.2001), *citing Bell v. Maryland,* 378 U.S. 226, 237, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (referring to the Supreme Court's "policy of refusing to decide a federal question in a case that might be controlled by a state ground of decision"). Having reviewed Midway's arguments regarding duty and causation, the Court concludes that given the extensive allegations in the complaint regarding foreseeability, dismissal on the state tort law grounds advanced by Midway without a more fully developed record would violate the spirit of the notice pleading requirements of the Federal Rules of Civil Procedure. *See, e.g.,* Fed.R.Civ.P. 8(a) ("A pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."); *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (describing the liberal standard of notice pleading).[29]

**29.** An extended discussion of the basis of the

conclusion that Midway's duty and causation

### B. State Constitutional Issues

■ "Ordinarily," a federal court is "obliged to address any state constitutional claims before reaching the merits of ... federal constitutional claims." *Harlen Assoc. v. Village of Mineola*, 273 F.3d 494, 497 n. 1 (2d Cir.2001), *citing Serio*, 261 F.3d at 150. If the issue is novel and the state constitutional terrain uncertain, prudence is required:

> Where a decision is to be made on the basis of state law, however, the Supreme Court has long shown a strong preference that the controlling interpretation of the relevant statute be given by state, rather than federal, courts. This preference is rooted in basic principles of federalism, for a federal court risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court.

*Serio*, 261 F.3d at 150, *citing Arizonans for Official English v. Arizona*, 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Lehman Bros. v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974); *Poe v. Ullman*, 367 U.S. 497, 526, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); and *In re Joint Eastern and Southern District Asbestos Litig.*, 78 F.3d 764, 776 (2d Cir.1996) (quotations omitted).

■ As set out below, the First Amendment analysis wholly resolves the issue, so even if the Connecticut constitution gives higher protection to expressive conduct, as Midway alleges, there is no need for this Court, sitting in diversity, to outline the exact contours of that heightened protection. Given these circumstances and the strong preference noted in *Allstate* that *state* courts interpret state constitutional law, the Court's analysis will proceed along federal constitutional lines.[30]

### C. Applicability of First Amendment to Wilson's Claims

Although Wilson is a private party seeking legal redress on a common law theory of liability, the First Amendment nonetheless has bearing and applicability here, as the State of Connecticut cannot provide a remedy, either by its common law or by statute, that violates Midway's free speech rights. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (discussed below); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (while race-based restrictive covenants in land conveyances do not themselves violate the Fourteenth Amendment because that Amendment applies only to state action, state court enforcement of such covenants would be unconstitutional state action).

---

arguments are unavailing at this stage of the litigation is unnecessary and perhaps unwise, since it would constitute only unreviewable dicta given the Court's conclusion that the claims are completely barred by the Constitution. *Cf. Horne v. Coughlin*, 191 F.3d 244, 246 (2d Cir.1999); *Mollica v. Volker*, 229 F.3d 366 (2d Cir.2000).

**30.** In some instances, "the Connecticut constitution, under article first, §§ 4, 5 and 14, provides greater protection for expressive activity than that provided by the first amendment to the federal constitution." *Leydon v. Town of Greenwich*, 257 Conn. 318, 348, 777

A.2d 552 (2001), *citing State v. Linares*, 232 Conn. 345, 380–81, 655 A.2d 737 (1995). In determining whether the Connecticut constitution affords greater protection in any particular case than that provided by the federal constitution, the Connecticut Supreme Court recognizes "that federal constitutional law sets minimum national standards," but "may determine that the protections afforded to the citizens of this state by [the Connecticut] constitution go beyond those provided by the federal constitution." *Leydon*, 257 Conn. at 347 n. 34, 777 A.2d 552 (citations omitted).

*New York Times* is particularly on point. There, the Supreme Court reviewed a libel judgment secured under the common law of Alabama against the New York Times. The Court "dispose[d] at the outset" of Alabama's contention, which had been relied on by the Alabama Supreme Court, that because the Fourteenth Amendment (which makes the First Amendment applicable to the states) is directed against state action and not private action, the First Amendment had no bearing on the private civil dispute between two citizens:

> Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only .... The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.

376 U.S. at 265, 84 S.Ct. 710, *citing Ex parte Virginia*, 100 U.S. 339, 346–347, 25 L.Ed. 676 (1879); *American Federation of Labor v. Swing*, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941).

### D. First Amendment Protection Accorded Video Games

■ The Second Circuit recently addressed the "elusive" nature of what constitutes First Amendment expression in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2nd Cir.2001), a case involving the First Amendment protection to be accorded to computer software. The court noted that while "[s]ome would confine First Amendment protection to political speech," *id.* at 446, *citing* Robert Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind. L.J. 1 (1971), "the law has not been so limited," as "[e]ven dry information, devoid of advo-

cacy, political relevance, or artistic expression, has been accorded First Amendment protection." 273 F.3d at 446, *citing, inter alia, Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (First Amendment embraces "[a]ll ideas having even the slightest redeeming social importance").

While there are no U.S. Supreme Court or Second Circuit decisions directly on point, several courts in other jurisdictions have addressed the scope of First Amendment protection enjoyed by video game manufacturers in a variety of contexts. In *American Amusement Machine Assoc. v. Kendrick*, 115 F.Supp.2d 943 (S.D.Ind. 2000) ("*Kendrick I*"), the court was asked to enjoin enforcement, on First Amendment grounds, of an Indianapolis ordinance that restricted minors' access to violent and sexually explicit video games. The *Kendrick I* court noted that there is no "precise test for determining how the First Amendment protects a given form of expression." *Id.* at 952; *see also Rothner v. City of Chicago*, 929 F.2d 297, 303 (7th Cir.1991) (assuming *arguendo* that the video games at issue were protected by the First Amendment). "Instead, the [Supreme] Court has stated generally: 'Each medium of expression ... must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.' Any given form of entertainment, activity, or interaction may or may not be protected under the First Amendment." *Kendrick I* at 952, *quoting Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) and *citing* David B. Goroff, *The First Amendment Side Effects of Curing Pac–Man Fever*, 84 Colum. L.Rev. 744 (1984).

The district court in *Kendrick I* concluded that at least some video games impacted by the ordinance at issue constitut-

expression protected by the First Amendment. *Id.* In reaching this conclusion, the court noted the difficulty of finding a "meaningful distinction between the Gauntlet [31] game's ability to communicate a story line and that of a movie, television show, book, or—perhaps the best analogy—a comic book. Certainly the distinction cannot simply be that the game is interactive. The internet is an interactive medium and receives First Amendment protection." *Id., citing Reno v. ACLU,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

The result in *Kendrick I*—a denial of the preliminary injunction sought by the video game manufacturer plaintiffs—was reversed in *American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 462, 151 L.Ed.2d 379 ("*Kendrick II*"), in which the Seventh Circuit seemed to go even farther than the district court in recognizing the First Amendment protection afforded video games. In *Kendrick II,* the court made the following literary-qua-constitutional pronouncement: "All literature (here broadly defined to include movies, television, and the other photographic media, and popular as well as highbrow literature) is interactive; the better it is, the more interactive. Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." 244 F.3d at 577.

Wilson argues that Mortal Kombat is not protected expression, relying principally on *America's Best Family Showplace v. City of New York,* 536 F.Supp. 170 (E.D.N.Y.1982), in which the court likened video games to mechanical entertainment devices, such as pinball machines, and recreational pastimes, such as chess and baseball, consisting of rules and implements:

> In no sense can it be said that video games are meant to inform. Rather, a video game, like a pinball game, a game of chess, or a game of baseball, is pure entertainment with no informational element. That some of these games "talk" to the participant, play music, or have written instructions does not provide the missing element of "information." I find, therefore, that although video game programs may be copyrighted, they "contain so little in the way of particularized form of expression" that video games cannot be fairly characterized as a form of speech protected by the First Amendment. Accordingly, there is no need to draw that "elusive" line "between the informing and the entertaining" referred to in *Winters v. People of New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

536 F.Supp. at 174 (citations omitted).

While the *America's Best* court's comparison of video games to pinball, chess and baseball seems to belie the *America's Best* plaintiff's own description of the video games at issue as " 'visual and aural presentations on a screen involving a fantasy experience in which the player participates,' " 536 F.Supp. at 173 (quoting from plaintiff's memorandum of law), the court was ruling on a motion for a preliminary injunction, and appears to have rejected as a factual matter the plaintiff's claim that the games at issue were similar to motion pictures, based on the evidentiary record before it demonstrating that the games were nothing more than digital pinball machines.

---

**31.** "Gauntlet" was one video game at issue in the case.

In sum, the cases are reconcilable on this point: While video games that are merely digitized pinball machines are not protected speech, those that are analytically indistinguishable from other protected media, such as motion pictures or books, which convey information or evoke emotions by imagery, are protected under the First Amendment. As recently suggested by the Second Circuit in *Corley*, the inquiry must be context-specific. Because a pinball machine is not protected speech, a video game that only simulated a pinball machine would not be protected speech. Conversely, comic books and movies are protected speech, so interactive versions of the same genre are also protected, even though they are labeled "games." In short, the label "video game" is not talismanic, automatically making the object to which it is applied either speech or not speech.

The question then becomes which criteria Mortal Kombat meets under the allegations in Wilson's complaint. Wilson distinguishes Mortal Kombat from protected media only by virtue of its interactivity. The nature of the interactivity set out in Wilson's complaint, however, tends to cut in favor of First Amendment protection, inasmuch as it is alleged to *enhance* everything expressive and artistic about Mortal Kombat: the battles become more realistic, the thrill and exhilaration of fighting is more pronounced. *See* Am. Compl. ¶ 5 ("The [interactive] technology utilized in [Mortal Kombat] was designed to have an immediate and lasting impact on the senses of the users as they used the product, this causing said users to feel exhilarated to such an extent that they would become obsessed by and addicted to the violent actions they were led to believe they were actually performing.").

Taking Wilson's allegations as true, the Court concludes that Mortal Kombat, as Wilson describes it, is protected First Amendment speech. Wilson's allegations about the game—that it presents violence as a problem solving technique and encourages players to "act out" the violence they see on screen—demonstrates that what her suit is targeting are the expressive elements of the game: its plot (i.e., the fact that advancing to different levels of the game requires increased violence), its characters (all of which are alleged to be violent), and the visual and auditory milieu in which the story line is played out (one character's "finishing move" or method of killing opponents is "tearing off his opponent's head leaving his spinal cord still dangling" [32]).

*American Booksellers Assoc., Inc. v. Hudnut*, 771 F.2d 323 (7th Cir.1985), is instructive. At issue in *Hudnut* was the City of Indianapolis's ordinance providing, *inter alia*, a private remedy for "victims" of pornography, defined as "the graphic sexually explicit subordination of women." *Id.* at 324. For the purposes of deciding the case, the court "accept[ed] the premises of this legislation": "Depictions of subordination tend to perpetuate subordination[, which in turn] leads to affront and lower pay at work, insult and injury at home, battery and pay on the streets." *Id.* at 329 (footnote omitted). However, the court found that such a starting premise actually undercut the City's argument for according less protection to pornography:

> [T]his simply demonstrates the power of pornography as speech. All of these unhappy effects depend on mental intermediation. Pornography affects how people see the world, their fellows, and social relations. If pornography is what pornography does, so is other speech.

32. Am. Compl. ¶ 3.

*Id.* In the same way, Wilson complains of the addictive power of portrayals of violence on the adolescent mind.[33] What she challenges as having warped Yancy's mind is not a pinball machine, board game or sport; rather, it is a gratuitously violent cross between a comic book and a Saturday morning cartoon, with the player having some control over the sequence of events and choice of weapon-wielding characters.

Even accepting Wilson's allegations that Mortal Kombat caused violence and physical harm to be visited upon her son and despite the seemingly minimal utility of such depictions of violence, the First Amendment precludes Wilson's action for damages unless Mortal Kombat's images or messages are "directed to inciting or producing imminent lawless action and [be] likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *accord Herceg v. Hustler Magazine,* Inc., 814 F.2d 1017, 1020 (5th Cir.1987); *Hudnut,* 771 F.2d at 333; *Sanders,* 188 F.Supp.2d at 1279–81. Applying *Brandenburg* to the facts Wilson alleges, she cannot prevail. Midway's speech—an interactive video story depiction in game form—is not alleged to be "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action," *Brandenburg,* 395 U.S. at 447, 89 S.Ct. 1827. Even with all inferences drawn in Wilson's favor, the complaint alleges conduct by Midway that at worst "amounted to nothing more than advocacy of illegal action at some indefinite future time[, which] is not sufficient," *Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973).

Plaintiff's only argument under *Brandenburg* is based on *Byers v. Edmondson,* 712 So.2d 681, 686 (La.App.1998), in which the Louisiana Supreme Court held that the allegations in plaintiff's complaint against the makers of the film "Natural Born Killers" were sufficient to overcome the Brandenburg test. The Court notes that *Byers* is clearly distinguishable, since the complaint in that case "alleged that the [movie makers] intended to incite viewers of the film to begin, shortly after viewing the film, crime sprees such as the one that led to the shooting of [the plaintiff]." *Id.* at 690. Such an allegation is understandably absent here, and Wilson claims only that Midway intended to addict players, and knew or should have known that its conduct would bring about harm.

The Court concludes, therefore, that the First Amendment is a complete bar to Wilson's negligent and intentional infliction of emotional distress claims against Midway.

## VIII. Conclusion

For the reasons set out above, Wilson's complaint fails to state a claim upon which relief can be granted. The product liability counts fail because Mortal Kombat is not a "product" within the purview of the CPLA; the unfair trade practices claim is time-barred; the loss of consortium claim

---

**33.** The scientific literature in this regard is apparently somewhat equivocal. *Compare* Craig A. Anderson & Brad J. Bushman, *Effects of Violent Video Games on Aggressive Behavior, Aggressive Cognition, Aggressive Affect, Psychological Arousal, and Prosocial Behavior: A Meta-Analytic Review of the Scientific Literature,* 12 Psychological Science 353 (Sep.2001) (concluding, based on review of research literature and studies, that violent video games increase aggressive behavior in children and young adults) *with, e.g.,* Michele J. Fleming & Debra J. Rickwood, *Effects of Violent Versus Nonviolent Video Games on Children's Arousal, Aggressive Mood, and Positive Mood,* 31 Journal of Applied Psychology 2047 (Oct.2001) (finding no significant increase in aggressive mood scores for either boys or girls after playing a violent video game).

is not recognized under Connecticut law in this context; and the negligent and intentional infliction of emotional distress claims are precluded by the First Amendment.

Midway's motions to dismiss [Doc. # 25 & 43] are GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.