Sheila **WATTERS, Individually and as Administratrix, Estate of Johnny Burnett, Deceased, Plaintiff–Appellant,**

v.

**TSR, INC., a/k/a TSR Hobbies, Inc., Defendant–Appellee.**

Nos. 89–5844, 89–5891 and 89–6021.

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1990.

Decided June 5, 1990.

Mark Edwards, Charles A. Saladino (argued), Thomas A. Dockter, Paducah, Ky., for plaintiff-appellant.

Stephen E. Smith, Jr. (argued), McMurry & Livingston, Paducah, Ky., for defendant-appellee.

Before KEITH and NELSON, Circuit Judges; and CONTIE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is a wrongful death case in which the plaintiff appeals from an order granting summary judgment to the manufacturer of a parlor game called "Dungeons & Dragons." The plaintiff alleges that her late son was an avid player of the game, and that it came to dominate his mind to such an extent that he was driven to suicide. She asserts that the defendant violated a duty of care in publishing and distributing the game materials; that the defendant violated a duty to warn that the game could cause psychological harm in fragile-minded children; and that the boy's death, which was caused by a self-inflicted gunshot wound, was a direct and proximate result of the defendant's alleged wrongdoing.

The defendant's motion for summary judgment was based on the First and Fourteenth Amendments and on familiar principles of tort law. Without addressing the common law questions, the district court held that the United States Constitution bars the imposition of liability in a case such as this. *Watters v. TSR, Inc.*, 715 F.Supp. 819 (W.D.Ky.1989). We see no need to reach the constitutional issue, because we believe that the law of Kentucky, on which the plaintiff's claim is based, would not permit recovery on the facts shown here. We shall affirm the district court's judgment on that basis.

I

Plaintiff Sheila Watters, a Kentucky resident, brought suit against defendant TSR, Inc., in a Kentucky circuit court. TSR, a Wisconsin corporation that has its principal place of business outside Kentucky, removed the case to federal court on diversity of citizenship grounds.

TSR's Dungeons & Dragons game is one in which the players assume the roles of characters in "adventures" suggested in illustrated booklets. These adventures, set in an imaginary ancient world, are narrated and orchestrated by a player known as the Dungeon Master. The results of various encounters between characters are deter-

mined by using dice in conjunction with tables provided in the published materials.

The rules of the game do not call for the physical acting out of any role. The game is usually played at a table or in some other comfortable setting. We have seen no indication in the record that the game's materials glorify or encourage suicide, or even mention it. It does not appear that the materials allude in any way to guns. Many schools and libraries use Dungeons & Dragons as a learning tool and as a means of promoting creativity. More than a million copies have been sold, according to TSR's records, and this figure does not include sales by the several other companies that produce and sell other role-playing games.

Mrs. Watters describes her son, Johnny Burnett, as a "devoted" Dungeons & Dragons player who became absorbed by the game to the point of losing touch with reality. She claims that as a result of his exposure to the game, "he lost control of his own independent will and was driven to self-destruction." The record does not disclose Johnny's age at the time of the tragedy.

TSR moved for summary judgment on various grounds, including these: (1) the First Amendment, as applied to the states by the Fourteenth Amendment, precludes a Kentucky court from imposing liability on the basis of what the defendant said or published; (2) TSR owed no duty to refrain from distributing the game or to warn of the possible consequences of playing it; and (3) Johnny Burnett having died at his own hand, the suicide was an intervening or superseding cause of his death. Granting summary judgment to the defendant on First Amendment grounds, the district court did not reach any of the state law issues.

## II

"Where there is no need to decide a constitutional question, it is a venerable principle of this Court's adjudicatory processes not to do so for '[t]he Court will not "anticipate a question of constitutional law in advance of the necessity of deciding it." ' *Ashwander v. TVA*, 297 U.S. 288, 346, 80 L.Ed. 688, 56 S.Ct. 466 [482] (1936) (Brandeis, J., concurring), quoting *Liverpool, New York and Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 28 L.Ed. 899, 5 S.Ct. 352 [355] (1885).... Quite simply, '[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' *Burton v. United States* 196 U.S. 283, 295, 49 L.Ed. 482, 25 S.Ct. 243 [245] (1905)." *Webster v. Reproductive Health Serv.*, [—— U.S. ——, ——], 106 L.Ed.2d 410, 441, 109 S.Ct. 3040, 3060 (1989) (O'Connor, J., concurring.)

We see no reason to depart in this case from the venerable and salutary principle that constitutional questions should be decided only where necessary. While the constitutional question was the only one addressed in the briefs on appeal, the underlying common law issues were adequately dealt with in the briefs filed with the district court. The propriety of a grant of summary judgment is a pure question of law, and although it is often very helpful, in diversity cases, for an appellate court to have the benefit of the district court's thinking on questions of state law, we do not believe a remand is called for in the present situation. The governing principles seem clear enough, even though there is no Kentucky caselaw directly in point.

## III

"Actionable negligence," under Kentucky law, "consists of a duty, a violation thereof, and consequent injury." *Illinois Central R.R. v. Vincent*, 412 S.W.2d 874, 876 (Ky.1967), as quoted in *M & T Chemicals, Inc. v. Westrick*, 525 S.W.2d 740, 741 (Ky.1974). "Every person owes a duty to every other person to exercise *ordinary care* in his activities to prevent any *foreseeable injury* from occurring to such other person," *Westrick*, 525 S.W.2d at 741, and it is "[a] fundamental principle of negligence ... that *there is no liability without fault.*" *Id.* (Emphasis supplied).

Liability without fault, or "strict liability," may sometimes attach where an injury is caused by an inherently dangerous product. As far as we have been able to ascertain, however, the doctrine of strict liability has never been extended to words or pictures. Other courts have looked in vain for decisions so expanding the scope of the strict liability doctrine. See, *e.g.*, *Herceg v. Hustler Magazine, Inc.*, 565 F.Supp. 802, 803 (S.D.Tex.1983), and *Cardozo v. True*, 342 So.2d 1053, 1056–57 (Fla.Dist.Ct.App.), *cert. denied*, 353 So.2d 674 (Fla.1977). See also *Beasock v. Dioguardi Enterprises, Inc.*, 130 Misc.2d 25, 29–30, 494 N.Y.S.2d 974, 978 (1985) ("The publications themselves did not produce the injuries and thus cannot serve as the basis for the imposition of liability under a theory of either strict products liability or breach of warranty...."). We are satisfied that there could be no recovery of damages in a case such as this without proof that the defendant was actually at fault—that the defendant violated its duty to exercise "ordinary care" to prevent "foreseeable injury."

The plaintiff's complaint alleges that the defendant violated its duty of ordinary care in two respects: it disseminated Dungeons & Dragons literature to "mentally fragile persons," and it failed to warn that the "possible consequences" of playing the game might include "loss of control of the mental processes." To submit this case to a jury on either theory, it seems to us, would be to stretch the concepts of foreseeability and ordinary care to lengths that would deprive them of all normal meaning.

█ The defendant cannot be faulted, obviously, for putting its game on the market without attempting to ascertain the mental condition of each and every prospective player. The only practicable way of insuring that the game could never reach a "mentally fragile" individual would be to refrain from selling it at all—and we are confident that the courts of Kentucky would never permit a jury to say that simply by marketing a parlor game, the defendant violated its duty to exercise ordinary care.

█ As to the supposed breach of a duty to warn, Kentucky law imposes a general duty on manufacturers and suppliers to warn of dangers known to them but not known to persons whose use of the product can reasonably be anticipated. *Garrison v. Rohm and Haas Co.*, 492 F.2d 346, 352 (6th Cir.1974), citing *Post v. American Cleaning Equipment Corp.*, 437 S.W.2d 516 (Ky.1968).

█ Johnny Burnett was certainly one of the class of people whose use of the game could reasonably have been anticipated, and there is no contention that he or his mother, Mrs. Watters, knew of any danger in using it. (An affidavit executed by Mrs. Watters indicates that she knew the game was often played at the public library; that Johnny and his friends played the game constantly after school and on weekends over a period of several years; and that never, either before or during the period when he and his friends were immersed in the game, did Johnny cause his mother any problems.) But if Johnny's suicide was not foreseeable to his own mother, there is no reason to suppose that it was foreseeable to defendant TSR.

In moving for summary judgment on the breach of duty question, defendant TSR put Mrs. Watters to her proof on foreseeability and knowledge—on whether TSR knew of some danger that made the suicide foreseeable. Mrs. Watters was not free simply to rest on her pleadings; she was required, by affidavits, depositions, answers to interrogatories, or the like, to "designate 'specific facts showing that there [was] a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), quoting Rule 56(e), Fed.R.Civ.P. This she failed to do. Aside from one vague reference to hearsay about the game's "dangerous propensities"—Mrs. Watters' affidavit concluded with a sentence reading, in its entirety, "I have subsequently read in many publications including the Paducah Sun of the dangerous propensities of the game Dungeons & Dragons"—the record sets forth no "specific fact" showing that the defendant's game was in fact danger-

ous or that the defendant had knowledge of any danger when the materials that Johnny and his friends had been using for so many years were manufactured and sold.*

The actual content of the materials in question would hardly have given TSR reason to foresee that players of the game would become more susceptible to murder or suicide than non-players. The materials make it clear that Dungeons & Dragons is a "let's pretend" game, not an incitement to do anything more than exercise the imagination. And the imaginary world referred to in the booklets—a world of magical spells, hidden treasures, and fantastic monsters—does not appear to be a world in which people kill themselves or engage in acts of wanton cruelty toward other people. We are not dealing here with the kind of violence or depravity to which children can be exposed when they watch television, or go to the movies, or read the fairy tales of the Brothers Grimm, for example.

Television, movies, magazines and books (including comic books) are far more pervasive than the defendant's games. Were the courts of Kentucky prepared to say that works of the imagination can be linked to a foreseeable danger of anti-social behavior, thereby giving rise to a duty to warn, one would expect to find Kentucky caselaw to that effect in lawsuits involving television networks, book publishers, or the like. There is no such caselaw. And what little authority exists outside Kentucky favors the defendant, not the plaintiff. See for example, *Zamora v. Columbia Broadcasting System*, 480 F.Supp. 199 (S.D.Fla. 1979) (no cause of action stated against three major television networks for allowing the plaintiffs' minor child to become so

"intoxicated" by television violence that he was "stimulated, incited and instigated" to shoot and kill an elderly neighbor.) *Cf. Herceg v. Hustler Magazine, Inc.*, 565 F.Supp. 802, *supra* (absent an allegation of incitement, no claim stated against magazine for publishing a description of "autoerotic asphyxiation" that allegedly prompted plaintiffs' decedent to hang himself).

Both *Herceg* and *Zamora* stressed that without actual incitement, First Amendment considerations "argue against the liability of a publisher for," as *Herceg* put it, "a reader's reactions to a publication...." 565 F.Supp. at 804. In the case at bar, as we have noted, the district court rested its decision solely on constitutional grounds. Other courts have done likewise in analogous situations. See, *e.g.*, *DeFilippo v. National Broadcasting Co., Inc.*, 446 A.2d 1036 (R.I.1982) (notwithstanding allegations of negligent failure to give adequate warnings, First Amendment barred recovery against broadcaster in action arising out of a 13–year–old boy's death by hanging after he had watched a mock hanging of Johnny Carson on television); *Walt Disney Productions, Inc. v. Shannon*, 247 Ga. 402, 276 S.E.2d 580 (1981) (absent "a clear and present danger of injury," First Amendment precluded imposition of tort liability where child hurt self in trying to duplicate sound effect technique demonstrated on television); *Olivia N. v. National Broadcasting Co., Inc.*, 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (1981) (absent incitement, and despite defendant broadcaster's alleged knowledge of studies showing that susceptible persons might imitate television violence, First Amendment barred submission to jury of action filed on behalf of 9–year–old victim of bizarre sexual crime committed by minors allegedly copying

---

* We have found two decisions, not cited in the briefs, mentioning claims that Dungeons & Dragons has dangerous propensities. In *State v. Molitor*, 729 S.W.2d 551 (Mo.Ct.App.1987), where a young woman was tied up and strangled after an all-night houseparty devoted to listening to music, consuming liquor, smoking marijuana and practicing martial arts, the defendant sought to introduce expert testimony suggesting that he had been "desensitized" at some point by playing Dungeons & Dragons. The appellate court sustained exclusion of the testimony on relevance grounds and because

the defendant's offers of proof made no showing that he had, in fact, been "desensitized." In *People v. Ventiquattro*, 138 App.Div.2d 925, 527 N.Y.S.2d 137 (1988), a fifteen-year-old boy who killed a companion with a shotgun gave the police several conflicting accounts of how the shooting occurred. In one account he stated that he was playing the game Dungeons & Dragons and shot the victim while fantasizing that it was his job to exterminate evil. Whether this particular account was truthful, and whether TSR ever learned of it, we do not know.

similar crime depicted on television), *cert. denied*, 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982); *Bill v. Superior Court*, 137 Cal.App.3d 1002, 187 Cal.Rptr. 625 (1982) (First Amendment concerns required entry of summary judgment for defendants, producers of a violent movie, in lawsuit brought on behalf of girl shot outside theater where defendants' movie was shown).

The able opinion of the district court in the present matter shows the seriousness of the constitutional concerns. A Kentucky court considering the application of Kentucky's common law in this situation would obviously be aware of the constitutional problems looming in the background—and if possible, we believe, such a court would avoid applying the common law in a way that would bring the constitutional problems to the fore. The constitutional problems would be avoided, of course, by holding that the plaintiff failed to show a justiciable issue as to any breach of a recognized legal duty—and that is where we think the Kentucky courts would come out.

### IV

■ By itself, moreover, a breach of duty is not enough to warrant recovery; there can be no liability for negligence if the negligence is not shown to have "caused" the injury complained of. And the courts of Kentucky have long recognized that the chain of causation may be broken by "facts [that] are legally sufficient to constitute an intervening cause." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky.1984).

Facts sufficient to constitute an intervening cause "are facts of such 'extraordinary rather than normal,' or 'highly extraordinary,' nature, unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim." *Id.*, quoting *House v. Kellerman*, 519 S.W.2d 380, 382 (Ky.1974), and Restatement (Second) of Torts §§ 442(b), 447.

Although Kentucky courts may once have treated the issue of intervening or superseding cause as one that could be resolved by the jury, even in the absence of a factual dispute, the highest court of Kentucky has now held to the contrary:

> "The question of whether an undisputed act or circumstance was or was not a superseding cause is a legal issue for the court to resolve, and not a factual question for the jury." *House v. Kellerman*, 519 S.W.2d at 382 (footnote omitted).

The fact of Johnny Burnett's suicide is undisputed. The third paragraph of Mrs. Watters' complaint affirmatively avers "[t]hat on the 29th day of September, 1987 the deceased departed this world as a direct and proximate result of a gun shot wound self inflicted by said deceased." Whether that extraordinary and tragic occurrence was or was not a "superseding cause" is thus a legal issue that must be resolved by the court.

Courts have long been rather reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act. See, e.g., *Scheffer v. Washington City V.M. & G.S.R.R.*, 105 U.S. 249, 26 L.Ed. 1070 (1882). Generally speaking, it has been said, the act of suicide is viewed as "an independent intervening act which the original tortfeasor could not have reasonably [been] expected to foresee." *Stasiof v. Chicago Hoist & Body Co.*, 50 Ill.App.2d 115, 122, 200 N.E.2d 88, 92 (1st Dist.1964), *aff'd sub nom. Little v. Chicago Hoist & Body Co.*, 32 Ill.2d 156, 203 N.E.2d 902 (1965), as quoted in *Jarvis v. Stone*, 517 F.Supp. 1173, 1175 (N.D.Ill.1981).

There are several exceptions to the general rule. Where a person known to be suicidal is placed in the direct care of a jailer or other custodian, for example, and the custodian negligently fails to take appropriate measures to guard against the person's killing himself, the act of self destruction may be found to have been a direct and proximate consequence of the custodian's breach of duty. *Sudderth v. White*, 621 S.W.2d 33 (Ky.App.1981). And because Kentucky's Workers' Compensation Act is liberally construed so as to effectuate the beneficent intent of the legislature in enacting it, the suicide of an employee covered by workers' compensation may be compensable if an injury sus-

tained in the course of the worker's employment causes a mental disorder sufficient to impair the worker's normal and rational judgment, where the worker would not have committed suicide without the mental disorder. *Wells v. Harrell,* 714 S.W.2d 498 (Ky.App.1986).

Outside the workers' compensation area, and beyond the situation where someone with known suicidal tendencies is placed in the care of a custodian who is supposed to guard against suicide, exceptions to the general rule have been recognized where a decedent was delirious or insane and either incapable of realizing the nature of his act or unable to resist an impulse to commit it. Restatement (Second) of Torts § 455; *cf. Jamison v. Storer Broadcasting Co.,* 511 F.Supp. 1286, 1291 (E.D.Mich.1981), *aff'd in relevant part and reversed in part on other grounds,* 830 F.2d 194 (6th Cir.1987), and the authorities there cited. But the plaintiff in the case at bar points to no facts suggesting that the suicide of Johnny Burnett came within any such recognized exception.

Johnny was not known to be suicidal, as far as the plaintiff has told us, and he was not placed in the care or custody of defendant TSR. Accordingly, the plaintiff can derive no benefit from cases such as *Sudderth v. White.* This is not a workers' compensation case, so *Wells v. Harrell* is not in point. Even under principles of workers' compensation law, moreover, it would have to be shown affirmatively that Johnny would not have taken his own life absent a mental disorder induced by exposure to Dungeons & Dragons. That would be hard to do, and there has been no attempt to do it. The fact is, unfortunately, that youth is not always proof against the strange waves of despair and hopelessness that sometimes sweep seemingly normal people to suicide, and we have no way of knowing that Johnny would not have committed suicide if he had not played Dungeons & Dragons. Finally, of course, it does not appear that Mrs. Watters can show that Johnny was delirious or psychotic, or that he acted under an irresistible impulse or while incapable of realizing what he was doing.

On the contrary, Mrs. Watters' affidavit shows affirmatively that Johnny Burnett, who lived in her household throughout his life, never caused Mrs. Watters any problems. He went to school regularly, and he took care of a paper route. The record contains no affidavit from a psychiatrist or similar expert suggesting that he suffered from any psychosis. As far as the record discloses, no one had any reason to know that Johnny Burnett was going to take his own life. We cannot tell why he did so or what his mental state was at the time. His death surely was not the fault of his mother, or his school, or his friends, or the manufacturer of the game he and his friends so loved to play. Tragedies such as this simply defy rational explanation, and courts should not pretend otherwise.

The judgment for the defendant is AFFIRMED.